Stephen K. Christiansen
(Nev. Bar No. 11081)
311 S. State, Ste. 250
Salt Lake City, Utah 84111
Telephone: 801.716.7016
Facsimile: 801.716.7017
steve@skclawfirm.com
*Attorney for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA, NORTHERN DIVISION

| | |
|---|---|
| ROBERT R. ROBISON, individually and derivatively on behalf of HUMBOLDT MINING COMPANY INC., <br><br> Plaintiff, <br><br> vs. <br><br> HUMBOLDT MINING COMPANY INC.; "BARON" WILLIAM DAVID LEAVITT; ROBERT D. DENNIS; and RANCHO SANTA FE MINING, INC., <br><br> Defendants. | **VERIFIED COMPLAINT** <br><br> **JURY DEMANDED** |

Plaintiff Robert R. Robison, individually and derivatively on behalf of Humboldt Mining

Company Inc., complains against the defendants herein and for cause of action alleges as

follows:

## PARTIES, JURISDICTION, AND VENUE

1.      Robert R. Robison is an individual domiciled in the State of Utah.

2.      Humboldt Mining Company Inc. ("Humboldt") is a Nevada corporation with its

principal place of business in the State of Nevada.

3.      "Baron" William David Leavitt is an individual domiciled in the State of

California and is an officer, director, and one of the majority shareholders of Humboldt. On

information and belief, "Baron" is a self-applied title that Leavitt sometimes uses as part of his name, but does not accurately represent any bona fide title he holds.

4.      Robert D. Dennis is an individual domiciled in the State of Tennessee and is an officer, director, and one of the majority shareholders of Humboldt. On information and belief, Dennis has also acted at times as legal counsel for Humboldt.

5.      Rancho Santa Fe Mining, Inc. ("RSF") is a Nevada corporation with its principal place of business in the State of California or Nevada.

6.      Diversity jurisdiction is proper in this Court under 28 U.S.C. § 1332 as there is complete diversity of citizenship between the plaintiff and all defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs. For purposes of the derivative claims, the jurisdiction of the defendants controls the domicile of the corporation under the rule of *Smith v. Sperling*, 354 U.S. 91 (1957), and *Diaz v. Davis (In re Digimarc Corp.)*, 549 F.3d 1223 (9th Cir. 2008), because Humboldt's officers, directors, and shareholders with a combined majority interest are antagonistic to the interests of Robison as a minority shareholder plaintiff.

7.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the plaintiff's claims occurred in this judicial district and/or a substantial part of the property that is the subject of the action is situated in this judicial district.

## GENERAL ALLEGATIONS

### The Robbie Mining Claims

8.      Robison has substantial background, training, experience, and expertise in mine engineering stretching over more than 65 years. He is currently 92 years old.

9.     Over the course of more than 30 years, Robison worked as a mining engineer and performed other engineering services, developing mining claims in and around Elko County, Nevada, among other places, both individually and for other companies.

10.     In or about 2008, Robison staked 55 unpatented lode mining claims located in sections 11, 12, 13, 14, 23, and 24, Township 44 North, Range 57 East, Mt. Diablo Meridian, Mardis Mining District, in Elko County. Using nomenclature of the type applied to such unpatented claims, Robison named these 55 claims after himself, designating them as the "Robbie Claims," Nos. 1-55.

11.     Robison staked the Robbie Claims in accordance with U.S. Bureau of Land Management ("BLM") regulations and complied with all other legal requirements necessary to obtain exclusive ownership rights to unpatented Robbie Claims Nos. 1-55.

12.     In the fall of 2009, Robison hired Thomas H. Chadwick, a consulting geologist with substantial experience, to do geologic mapping on the Robbie Claims and recommend a drilling program. Chadwick had done consulting work for Barrick Gold Corporation and was considered to be one of the best and most experienced mapping geologists in Nevada.

13.     Based on his geologic mapping, Chadwick suggested that the best mineralization was in the vicinity of the Black Warrior Mine on and near Robbie Claim No. 31. This area of the Robbie Claims was thus the logical and recommended place for a drilling program.

14.     The U.S. Department of Agriculture Forest Service ("Forest Service") administers the land where the Robbie Claims are located. The Forest Service requires a Plan of Operations to perform exploratory drilling programs. On September 19, 2009, Robison prepared and submitted to the U.S. Forest Service a Plan of Operations with respect to the Robbie Claims.

15.     At the time Robison established rights in the Robbie Claims, Humboldt was not in existence, and Robison did not know either Leavitt or Dennis.

**The 2010 Lease**

16.     In January 2010, Robison received a cold call from Robert Dennis. Dennis expressed that the purpose of his call was to see if Robison was interested in leasing Robbie Claims Nos. 1-55. Dennis told Robison that he lived in San Diego, California. On information and belief, Dennis was at that time a neighbor and friend of Leavitt's. Dennis said he would prepare a mineral lease agreement and send it to Robison for review.

17.     Dennis sent Robison a draft of a lease agreement for the Robbie Claims in March 2010. Robison sent the agreement to his attorney Richard Harris in Reno, Nevada, for review. Following his attorney's review, Robison determined to lease the Robbie Claims to Humboldt on the terms expressed in the draft lease agreement. Robison so advised Dennis, who finalized the agreement and sent it to Robison for signature. Robison signed it on or about March 18, 2010, with an effective date of April 1, 2010. On information and belief, Leavitt signed it for Humboldt as well, identifying himself as president of Humboldt. A true and correct copy of this Mineral Lease Agreement and Option to Purchase (the "2010 Lease") is attached hereto as Exhibit A and incorporated herein by reference.

18.     On information and belief, Dennis incorporated Humboldt on or about March 26, 2010, listing himself as the sole director. On information and belief, Leavitt and Dennis were the sole shareholders of Humboldt at the time of its incorporation.

19.     Robison's intention in leasing the Robbie Claims to Humboldt was to allow Humboldt to develop the property. The 2010 Lease contained a provision that would pay Robison net smelter royalties ("NSR") from mining operations on the Robbie Claims.

4

20.     On information and belief, Leavitt and Dennis lacked experience in mining. Consequently, they sought to hire Robison to do mine engineering work for Humboldt. Robison agreed to do such work.

21.     Robison subsequently received a 5% ownership interest in Humboldt. On information and belief, Leavitt and Dennis combined retained a majority and controlling interest in Humboldt.

22.     In the 2010 Lease, Humboldt agreed to spend up to $1,300,000 in initial drilling, mapping, and exploration of the leased premises within two years after the effective date of the 2010 Lease, the type and amount of such expenditures to be in Humboldt's sole discretion.

23.     In early April 2010, Robison informed Dennis by telephone and email of the Plan of Operations that had been approved by the Forest Service for the Robbie Claims. Robison also informed Dennis of the recommendation from consulting geologist Chadwick to develop the Robbie Claims near the Black Warrior Mine. Robison invited Dennis to meet to discuss final plans for a proposed drilling program. Dennis declined to meet but did approve pursuing the drilling program.

24.     Based on the Chadwick recommendation, Humboldt contracted with Timberline Drilling Company ("Timberline") for the first round of exploratory drilling. Robison kept Dennis apprised of the progress made on the exploratory drilling. Dennis met with Robison on the site after the drilling began. On information and belief, during that meeting Chadwick explained to Dennis the time and capital involved in a mining exploration process, which Dennis was not familiar with before that time.

25.     Timberline drilled five exploratory drill holes, two of which demonstrated significant inferred mineral reserves, and took core samples in the process. Several good gold

mineralized cores were encountered. Drill hole #1 demonstrated 20 feet of mineable ore, a strong

showing for a first exploratory hole. As Chadwick had suggested, the best mineralization

encountered was in the vicinity of the Black Warrior Mine on and near Robbie Claim No. 31,

which exhibited typical Carlin type sediment-hosted gold mineralization.

26.     Additional capital and drilling would have been required to determine whether

mining on the claims would be profitable. On information and belief, Dennis's and Leavitt's lack

of mining background was such that they did not understand this, despite Chadwick's

explanation. Consequently, despite Robison's effort, neither Dennis nor Leavitt (through Dennis)

expressed any interest in discussing future project development or drilling plans.

27.     On information and belief, the initial officers and directors of Humboldt were

Dennis as sole director and secretary, Leavitt as president, and Leavitt's wife Hannah Theresa

Kelly Leavitt as treasurer.

28.     Robison first met Leavitt and his wife on October 29, 2011, more than a year and

a half after first leasing the Robbie Claims to Humboldt, at the Leavitts' home in the San Diego

area. All interactions by Robison with Leavitt before that time were made through Dennis. From

the time Robison first became a shareholder of Humboldt to the present, Humboldt held no

regular or noticed shareholder meetings.

29.     After entry of the 2010 Lease, Robison staked and claimed additional Robbie

Claims, Nos. 56-109 and others, in the same general vicinity as Nos. 1-55. The total area

encompassed by Robbie Claims Nos. 1-109 was approximately 2000 acres.

30.     The 2010 Lease included an obligation for Humboldt to pay to Robison advance

royalty payments pursuant to a schedule set forth therein. The 2010 Lease also included an

option for Humboldt to purchase the Robbie Claims for $20 million while the Agreement remained in effect.

31.     Beginning in 2013, Humboldt did not pay Robison advance royalty payments pursuant to the schedule set forth in the 2010 Lease.

32.     Humboldt never did exercise its option under the 2010 Lease to purchase the Robbie Claims from Robison.

33.     In 2013, Robison advised Dennis that Humboldt had not complied with the terms of the 2010 Lease and that Robison would be presenting notice of default. Dennis advised Robison, who was nearly 90 at the time, that, if he did, then Dennis would have Robison in court for the "rest of his life."

34.     In 2013, Robison advised Dennis that Humboldt was in default of its obligations under the 2010 Lease as of July 1, 2013.

35.     Humboldt through Dennis subsequently acknowledged to Robison that it was in breach of the 2010 Lease and that it had insufficient funds to continue with an exploratory drilling operation or to pay Robison advance royalties.

**The 2013 Cancellation**

36.     Robison and Humboldt subsequently entered into an Agreement dated September 26, 2013 ("the 2013 Cancellation"), which cancelled the 2010 Lease. A true and correct copy of the 2013 Cancellation is attached hereto as Exhibit B and incorporated herein by reference.

37.     In consideration for the cancellation of the 2010 Lease, Humboldt agreed in the 2013 Cancellation to give Robison an additional 5% interest in Humboldt, bringing his total stock ownership interest in Humboldt to 10%.

38.     In further consideration for the cancellation of the 2010 Lease, Humboldt agreed in the 2013 Cancellation that the advance royalty payments totaling $24,200 that were due and owing to Robison under the 2010 Lease would be satisfied from the proceeds of two reclamation bonds being held by the Forest Service in the amount of $11,405.70 and $12,300 respectively. Those bonds were pledged to Robison. Humboldt agreed that when the bonds were released from the Forest Service they would be paid over to Robison in satisfaction of the advance royalty payments due and owing to him.

39.     Humboldt further agreed in the 2013 Cancellation that Robison would be named Chief Executive Officer of Humboldt.

40.     Despite the clear terms of the 2013 Cancellation, Humboldt failed and refused to give Robison an additional 5% interest in Humboldt to bring his total stock ownership interest to 10%.

41.     Despite the clear terms of the 2013 Cancellation, Humboldt also failed and refused to pay Robison as agreed in the 2013 Cancellation or to take steps to redeem the bonds.

42.     Despite the clear terms of the 2013 Cancellation, Humboldt, Dennis, and Leavitt failed or refused to name or recognize Robison as its Chief Executive Officer.

43.     Despite not exercising its option to purchase the Robbie Claims from Robison under the 2013 Cancellation, and despite relinquishing its rights to the Robbie mining claims in the 2013 Cancellation by cancelling the 2010 Lease, Humboldt asserts against Robison an interest in the Robbie Claims, alleging Humboldt is 100% owner of the Robbie Claims.

**Robison's Work for Humboldt**

44.     On October 29, 2011, Robison attended a meeting at Leavitt's residence in San Diego, California. At that meeting, knowing the results of the initial round of exploratory

drilling, Leavitt announced his intention to reopen the Prunty Mine, a mine historically owned by Leavitt's family that had operated in the early to mid-1900s on two patented mining claims totaling approximately 40 acres – the "Virginia" and "Vanity Fair" Claims.

45.    Robison responded that exploratory drilling should be completed to verify viable mineable areas rather than simply reopening the Prunty Mine. Nevertheless, Leavitt and Dennis determined to proceed in reopening the Prunty Mine.

46.    The mining engineering work Dennis and Leavitt asked Robison to do included substantial work associated with reopening the Prunty Mine.

47.    The State of Nevada's Division of Environmental Protection (the "Division") was the responsible agency to contact and send necessary data and engineering reports related to the anticipated mining activities. Robison acted as the on-site mining engineer to work with the Division.

48.    Robison provided intense mine engineering services, including meeting sampling and monitoring requirements set by the Division for the Prunty Mine. Robison also reworked his own prior Plan of Operations and submitted it to the Forest Service. Humboldt, Leavitt, and Dennis knew Robison was providing these services, that they provided a benefit, and that Robison was not doing so gratuitously.

49.    After two years of intense engineering by Robison, the Division issued the Prunty Mine Project Water Pollution Control Permit NEV201104. On information and belief, while Robison performed this work, Leavitt and Dennis did virtually nothing to advance development of the Robbie Claims or to advance the work of Humboldt.

50.    During this time period, Dennis and Leavitt (through Dennis) repeatedly advised Robison that the patented mining claims were part of Humboldt.

9

**Loss of the Bright Deal and Withholding of the Patented Claims**

51.     In or about late 2013, the shareholders in Humboldt discussed pursuing a joint venture with one or more third parties.

52.     Acting pursuant to those discussions, Robison identified a viable candidate for a joint venture, Canadian mining company Bright Mines Incorporated ("Bright").

53.     On October 25, 2013, Robison made a presentation to Bright for the purpose of creating a joint venture. Based on Robison's efforts, and with the approval of Leavitt and Dennis, Robison was able to secure a Letter of Intent with Bright for the joint venture, which was signed by Bright's director Harold Jahn on or about November 10, 2013, and subsequently extended beyond its expiration date by agreement.

54.     Under the terms of the Letter of Intent, Bright was to provide a 2% NSR, pay a minimum advance of $100,000 per annum on the annual royalty for the life of the mine starting March 1, 2014, and have an open option and right of first refusal to purchase the NSR at any time for $5 million. Robison, Leavitt, and Dennis agreed that the annual royalty would be divided three ways among themselves (approximately $33,333 each) and distributed to each of the shareholders of Humboldt each year. Bright also agreed to pay for representative drilling using its own funds discretionarily.

55.     On December 16, 2013, the shareholders in Humboldt met with representatives of Bright. In attendance were Leavitt, Dennis, Robison, his sister Linda Robison, his son Reed Robison, Bright's Harold Jahn, Robison's friend Lynn Richards, and broker Philip Dunn. During the course of that meeting, Leavitt and Dennis insisted on more money from Bright than had previously been agreed in the parties' Letter of Intent. Leavitt then declared that all of the precious metals to be taken from the patented mining claims, Virginia and Vanity Fair, would

belong to him personally. As a result of Leavitt's and Dennis's conduct at the meeting of December 16, 2013, Bright withdrew from the joint venture outlined in the Letter of Intent.

56.     Robison subsequently discovered that Leavitt had never leased or otherwise transferred his interests in the patented Virginia and Vanity Fair Claims to Humboldt. Both Leavitt and Dennis knew this but did not tell Robison.

57.     The patented mining claims were an integral part of the exploratory drilling program and were reflected in the Plan of Operations prepared by Robison for Humboldt. On information and belief, Leavitt and Dennis knew this and should have known this. Bright relied on the Plan of Operations filed with the Forest Service for its Letter of Intent. Leavitt's announcement, however, would render the Plan a nullity. Moreover, the effect of Leavitt's and Dennis's conduct was to have Robison do all the mine engineering work, monitoring services, and Plan of Operations for mining claims owned by Leavitt individually, with no compensation for the work.

58.     In addition to the positions taken by Leavitt and Dennis at the Bright meeting of December 16, 2013, Leavitt and Dennis further took the position that Robison individually must participate in paying back investors in the operation, an obligation that did not belong to Robison, that Robison did not incur and to which he did not agree, and about which he had not previously been consulted or made aware. The purported obligation of Robison was to contribute one-third of $500,000, or approximately $166,000, to repay some unknown individuals whose sole contact with Humboldt, on information and belief, had been with Leavitt and/or Dennis.

59.     Following Bright's withdrawal based on Leavitt's and Dennis's conduct, Robison notified Dennis and Leavitt (through Dennis) that the refusal to make the patented mining claims available for the joint venture was contrary to everything that Robison had worked for and had

significantly altered the parties' relationship. Additionally, because of obligations he had undertaken prior to that time on Humboldt's behalf, Robison's services continued into 2014 to comply with monitoring requirements for taking rock samples and water samples, as well as providing engineering reports. Consequently, Robison demanded that he be paid for the mining engineering work required by the Division, since he had not provided those services for free.

60.     The estimated value of these services was $200,000 to $250,000. Despite demand, Robison has not been paid for these services, nor has he received equivalent value in any other form, agreed or otherwise.

61.     Approximately two-and-a-half months after the Bright deal was lost, and after Robison had expressed his desire to no longer have anything to do with Leavitt and Dennis, Leavitt and his wife Hannah leased the Virginia and Vanity Fair Claims to Humboldt in a lease agreement similar in form to the 2010 Lease. On information and belief, Dennis signed this lease for Humboldt.

**Interference with the Robbie Claims**

62.     As noted above, Humboldt did not exercise the option to purchase the Robbie Claims from Robison pursuant to the 2010 Lease. Instead, Humboldt entered into the 2013 Cancellation whereby it cancelled the 2010 Lease.

63.     The 2013 Cancellation did not give Humboldt any additional rights in the Robbie Claims.

64.     Notwithstanding these facts, Humboldt, Dennis, and Leavitt have taken the position that Robison has no rights to any of the Robbie Claims.

65.     Because of the competing claims made by these defendants to the Robbie Claims, Robison has been unable to develop the Robbie Claims and has been required to file suit to vindicate his claims.

66.     The work done by Robison on the Robbie Claims generated data demonstrating substantial inferred reserves that, but for the conduct of Humboldt, Leavitt, and Dennis, had a substantial probability of increasing proven reserves in an estimated minimum amount of $20 million. Such data included the Carlin Trend Services geochemical samples survey; ground magnetic surveys by Magee Geophysical; samples from ALS Mineral Laboratories in Elko; interpretation of the ground magnetic surveys by geophysicist J.L. Wright; and other geological data.

**Humboldt's Misuse of Robison's Name and Alleged Affiliation**

67.     Because of the ongoing dispute among Robison, Leavitt, and Dennis, Robison resigned as officer, director, or any other position with Humboldt. Robison retained his stock ownership interest in Humboldt and is a minority shareholder.

68.     Despite demand, despite no factual basis for doing so, and despite a promise to cease from doing so, Humboldt has continued to use Robison's name and affiliation on its website, www.humboldtmining.com, designating him as the company's "Chief Engineer," a publicized designation made without consulting Robison. Humboldt has also continued to list his son Reed on its website as a "consultant" to Humboldt, despite Robison's demand that his name likewise be disassociated from Humboldt, and despite the fact that Reed's consulting to Humboldt was of a limited duration more than three years ago.

**The RSF Deal and Misuse of Robison's Name and Alleged Affiliation**

69.     On or about February 18, 2016, Robison received in the mail a letter dated February 10, 2016, from Action Stock Transfer in Salt Lake City, indicating that it had been "instructed to send you the enclosed stock certificate(s)." Enclosed with the letter was a stock certificate for 675,000 shares of restricted stock in RSF.

70.     Robison subsequently learned that Humboldt had entered into a transaction with RSF that took place, on information and belief, in or about October 2015 (the "RSF Deal"). The RSF Deal provided for the provision of stock in RSF in exchange for all assets of Humboldt. In connection therewith, Humboldt and RSF stated their intention that the RSF Deal qualify as a tax-free reorganization under Section 368(a)(1)(B) of the Internal Revenue Code.

71.     Before entering into the RSF Deal, Humboldt did not provide a dissenter's rights notice to Robison as a minority shareholder. Rather, Robison simply received shares of RSF in the mail without an explanation or a notice of rights. Robison also was not invited to participate in a shareholder vote on the matter, and no shareholder vote was taken.

72.     On information and belief, Humboldt represented to RSF, contrary to the 2013 Cancellation, that Robison was a 5% shareholder in Humboldt, and RSF provided shares in that percentage to Robison.

73.     Humboldt has purported to transfer all of its assets to RSF. Because Humboldt asserts ownership of the Robbie Claims owned by Robison, on information and belief Humboldt's purported transfer of all assets to RSF has purported to include the Robbie Claims.

74.     In connection with the RSF Deal, RSF has represented to the public that it intends to follow the "Apex Rule" in mining along the primary axis of the claims RSF alleges it is allowed to follow and to continue mining the Prunty Mine area beyond the properties presently

owned by RSF. The patented mining claims, Virginia and Vanity Fair, constitute 40 acres. The implication from RSF is that the apex mining law entitles it to expand its operations into the extensive unpatented claims area owned by Robison. RSF is therefore attempting to do through the back door what Humboldt did not do through the front, trying to take control of the development of approximately 2000 acres owned by Robison through the 40 acres now controlled by Humboldt and/or RSF – even though no veins have actually been mined on the patented claims that would entitle RSF to pursue them into the Robbie Claims.

75.     Under the RSF Deal, Humboldt shareholders purportedly received 13.5 million shares in RSF. However, Robison only purportedly received 675,000 shares, which would equate to a 5% interest, not 1.3 million shares, as per his 10% interest. Robison's purported new interest in RSF therefore diluted his interest in the assets owned by Humboldt.

76.     Meanwhile, under the RSF Deal, Leavitt purportedly received 6,750,000 shares in RSF and a seat on the Board of Directors, or ten times as many as Robison; and Dennis purportedly received 5,400,000 shares in RSF, or eight times as many as Robison. Leavitt and Dennis therefore increased their interests in the assets owned by Humboldt on a percentage basis vis-à-vis Robison.

77.     RSF's public statements include a statement that "our independent registered public accountants have expressed doubt about our ability to continue as a going concern."

78.     RSF's public statements also include statements that Robison is offering RSF stock for sale to the public, which is not true; and that Robison's ownership in Humboldt, which purportedly has been transferred to ownership in RSF, equates to a 5% interest rather than 10%.

79.     RSF's public statements further include statements that mention Robison's name as if he is actively associated with the project RSF is promoting and touting when he is not.

80.     RSF's public statements also include statements suggesting that Robison's opinion concerning areas of interest described in the interpretation of the ground magnetic survey applies beyond the patented mining claims area to the rest of the Northwest corridor coverage. This is not accurate.

81.     RSF's public statements include a statement that RSF "acquired" Humboldt.

**Derivative Claim Prerequisites under Fed. R. Civ. P. 23.1**

82.     Robison was a shareholder of Humboldt at the time of the transactions complained of herein.

83.     This lawsuit is not a collusive action to confer jurisdiction that the Court would otherwise lack.

84.     The effort undertaken by Robison to obtain desired action from Humboldt's directors and majority shareholders, and the reasons for not obtaining the action or not making the effort, are:

a.     The previous allegations in this complaint are incorporated herein by reference in support of the basis for the derivative claims asserted herein.

b.     Leavitt and Dennis are the only officers, directors, and majority shareholders in Humboldt and are in control of the finances, operations, assets, and claims of Humboldt.

c.     Leavitt and Dennis have taken action hostile to Robison and favorable to themselves, including but not limited to withholding the patented mining claims from Humboldt until the Bright deal was lost; then entering a lease between Leavitt and Humboldt (through Dennis) after Robison expressed his desire to no longer associate

with them; then using those assets to secure the RSF Deal that was beneficial to themselves and detrimental to Robison vis-à-vis each other.

d.       Both Dennis and Leavitt have threatened to pursue criminal charges against Robison based on the issues alleged herein, Dennis by telephone on February 17, 2015, and Leavitt by email on June 17, 2015.

e.       In a letter dated February 15, 2015, and again in an affidavit dated July 2, 2015, Dennis accused Robison of misrepresentation, gross negligence and mismanagement, breach of duties, and other unlawful misconduct, and indicated an intention to pursue claims as necessary.

f.       Robison does not trust Leavitt or Dennis, and the relationship between these individuals is irreparably broken. The parties have communicated only through counsel for more than a year.

g.       This complaint alleges breach of fiduciary duties by Leavitt and Dennis and aiding and abetting each other in breaching those duties owed to Humboldt. Under these circumstances, Leavitt and Dennis cannot reasonably be expected to cause Humboldt to bring such claims against themselves, and demand to do so would be futile.

h.       Leavitt and Dennis entered into the RSF Deal on behalf of Humboldt without notice of dissenter's rights given to Robison, in contravention of his position as a minority shareholder, highlighting the lack of these individuals' intent to take steps that are in the best interests of Humboldt as opposed to themselves individually.

i.       Leavitt and Dennis are the directors of Humboldt and have a material interest in the subject of any demand to Humboldt in that they would be the target of the

demand. As the sole directors of Humboldt, Leavitt and Dennis dominate and control Humboldt's board of directors.

    j.  Dennis and Leavitt would be materially affected to their detriment by action that would be demanded of them, in a manner not shared by Humboldt or Robison.

**Alternative Claims for Relief**

   85.  The claims advanced herein are advanced in the alternative under Fed. R. Civ. P. 8(d)(2) and (3), to the extent necessary.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract: Robison vs. Humboldt)**

   86.  The previous paragraphs are incorporated herein by reference.

   87.  Robison and Humboldt entered into valid agreements as described herein, including but not necessarily limited to the 2013 Cancellation.

   88.  By at least its conduct alleged herein, Humboldt breached the agreements entered into with Robison.

   89.  As a result of Humboldt's breach, Robison has suffered damages in an amount to be proven at trial.

**SECOND CLAIM FOR RELIEF**
**(Breach of Implied Covenant: Robison vs. Humboldt)**

   90.  The previous paragraphs are incorporated herein by reference.

   91.  Robison and Humboldt entered into valid agreements as described herein, including but not necessarily limited to the 2013 Cancellation.

   92.  By at least its conduct alleged herein, Humboldt performed in a manner that was unfaithful to the purpose of the agreements or deliberately contravened the intention and spirit of the agreements.

18

93.     Humboldt's conduct was a substantial factor in causing damage to Robison.

94.     As a result of Humboldt's breach of the implied covenant of good faith and fair dealing, Robison has suffered damages in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF
**(Breach of Contract: Robison vs. Leavitt & Dennis)**

95.     The previous paragraphs are incorporated herein by reference.

96.     Robison, Leavitt, and Dennis entered into valid agreements as described herein, including but not necessarily limited to the agreement that the Virginia and Vanity Fair Claims would be part of the Bright deal and the agreement for the distribution of monies from the Bright deal.

97.     By at least their conduct alleged herein, Leavitt and Dennis breached the agreements.

98.     As a result of the breach, Robison has suffered damages in an amount to be proven at trial.

### FOURTH CLAIM FOR RELIEF
**(Breach of Implied Covenant: Robison vs. Leavitt & Dennis)**

99.     The previous paragraphs are incorporated herein by reference.

100.    Robison, Leavitt, and Dennis entered into valid agreements as described herein, including but not necessarily limited to the agreement that the Virginia and Vanity Fair Claims would be part of the Bright deal and the agreement for the distribution of monies from the Bright deal.

101.    By at least their conduct alleged herein, Leavitt and Dennis performed the agreements in a manner that was unfaithful to the purpose of the agreements or deliberately contravened the intention and spirit of the agreements.

102.    Leavitt's and Dennis's conduct was a substantial factor in causing damage to Robison.

103.    As a result of Leavitt's and Dennis's breach of the implied covenant of good faith and fair dealing, Robison has suffered damages in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duties: Robison vs. Leavitt & Dennis)

104.    The previous paragraphs are incorporated herein by reference.

105.    At all relevant times alleged herein, a fiduciary relationship existed between Robison and Leavitt and between Robison and Dennis.

106.    Within the scope of this relationship, Leavitt and Dennis had the duties to exercise care, loyalty, full disclosure, fairness, and good faith in their dealings with Robison.

107.    By at least their conduct alleged herein, Leavitt and Dennis have violated one or more of these duties.

108.    As a result of Leavitt's and Dennis's breach of their fiduciary duties, Robison has suffered damages in an amount to be proven at trial.

109.    These defendants' conduct was willful, wanton, malicious, and oppressive, entitling Robison to punitive damages in an amount to be determined by the trier of fact.

## SIXTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duties: Humboldt vs. Leavitt & Dennis)

110.    The previous paragraphs are incorporated herein by reference.

111.    At all relevant times alleged herein, a fiduciary relationship existed between Humboldt and Leavitt and between Humboldt and Dennis.

112.    Within the scope of this relationship, Leavitt and Dennis had the duties to exercise care, loyalty, full disclosure, fairness, and good faith in their dealings with Humboldt.

113.    By at least their conduct alleged herein, Leavitt and Dennis have violated one or more of these duties.

114.    As a result of Leavitt's and Dennis's breach of their fiduciary duties, Humboldt has suffered damages in an amount to be proven at trial.

115.    These defendants' conduct was willful, wanton, malicious, and oppressive, entitling Robison to punitive damages in an amount to be determined by the trier of fact.

### SEVENTH CLAIM FOR RELIEF
**(Aiding and Abetting Breach of Fiduciary Duties:**
**Robison vs. Leavitt & Dennis)**

116.    The previous paragraphs are incorporated herein by reference.

117.    At all relevant times alleged herein, a fiduciary relationship existed between Robison and Leavitt and between Robison and Dennis.

118.    By at least the conduct alleged herein, Leavitt and Dennis both breached the fiduciary relationship.

119.    By at least the conduct alleged herein, Leavitt and Dennis knowingly participated in the breach by the other.

120.    As a result of Leavitt's and Dennis's aiding and abetting of the breach of the fiduciary duties by the other, Robison has suffered damages in an amount to be proven at trial.

121.    These defendants' conduct was willful, wanton, malicious, and oppressive, entitling Robison to punitive damages in an amount to be determined by the trier of fact.

### EIGHTH CLAIM FOR RELIEF
**(Aiding and Abetting Breach of Fiduciary Duties:**
**Humboldt vs. Leavitt & Dennis)**

122.    The previous paragraphs are incorporated herein by reference.

123.     At all relevant times alleged herein, a fiduciary relationship existed between Humboldt and Leavitt and between Humboldt and Dennis.

124.     By at least the conduct alleged herein, Leavitt and Dennis both breached the fiduciary relationship.

125.     By at least the conduct alleged herein, Leavitt and Dennis knowingly participated in the breach by the other.

126.     As a result of Leavitt's and Dennis's aiding and abetting of the breach of the fiduciary duties by the other, Humboldt has suffered damages in an amount to be proven at trial.

127.     These defendants' conduct was willful, wanton, malicious, and oppressive, entitling Robison to punitive damages in an amount to be determined by the trier of fact.

### NINTH CLAIM FOR RELIEF
**(Violation of Minority Shareholder Rights: Robison vs. Humboldt, Leavitt, Dennis & RSF)**

128.     The previous paragraphs are incorporated herein by reference.

129.     Although denominated as an asset sale, the transaction between Humboldt and RSF is, in effect, a merger or is otherwise subject to the provisions of NRS 92A.380. Humboldt and RSF agreed that it was their intention that the RSF Deal qualify as a reorganization under the Tax Code. RSF also represented to the public that it was "acquiring" Humboldt. Further, on information and belief, Leavitt and Dennis on behalf of Humboldt purportedly stripped the Humboldt shares of any value in exchange for allegedly equivalent percentages of ownership in RSF.

130.     Neither Dennis nor Leavitt nor Humboldt provided to Robison the statutory dissenter's notice required by NRS 92A.430, at any time, in connection with the RSF transaction.

131.    By at least the conduct alleged herein, the merger was approved by unlawful or fraudulent conduct as the same is defined in this context under the rule in *Cohen v. Mirage Resorts, Inc.*, 62 P.3d 720 (Nev. 2003).

132.    By at least the conduct alleged herein, Leavitt and Dennis through Humboldt undertook the deal with RSF based on a lack of fair dealing and lack of a fair price. Leavitt and Dennis failed to make independent, fully informed decisions regarding the transaction and to fully disclose material information to Robison before a vote was taken. Moreover, Robison was not given the right to vote on the impending deal, and no vote was taken. Furthermore, Leavitt and Dennis as majority shareholders breached their duties to Robison as a minority shareholder, as already alleged hereinabove.

133.    By at least the conduct alleged herein, Leavitt and Dennis as majority shareholders approved the transaction at the expense of Robison, the minority shareholder. Furthermore, Leavitt and Dennis as directors, officers, and majority shareholders had conflicts of interest or were improperly compensated or influenced in return for their approval of the transaction.

134.    Robison is entitled to all relief provided by Nevada statutory and common law, including but not necessarily limited to that provided in NRS 92A.300 to 92A.500 and *Cohen v. Mirage Resorts, Inc.*, 62 P.3d 720 (Nev. 2003). Such relief, which is sought in the alternative as necessary, includes but is not necessarily limited to damages against all defendants named herein, injunctive relief, rescission of the RSF Deal, and/or a fair valuation and payment of Robison's shares.

## TENTH CLAIM FOR RELIEF
### (Civil Conspiracy: Robison vs. Leavitt & Dennis)

135.    The previous paragraphs are incorporated herein by reference.

136.   Leavitt and Dennis constitute a combination of two persons.

137.   By the conduct alleged herein, Leavitt and Dennis engaged in concerted action.

138.   By engaging in concerted action, as alleged herein, Leavitt and Dennis intended to accomplish an unlawful objective for the purpose of harming Robison, including but not necessarily limited to depriving Robison of his lawful rights in the Robbie Claims, employing Robison to develop the Prunty Mine for the benefit of Leavitt individually, obtaining services from Robison without compensation, depriving Robison of rights under the 2013 Cancellation, continuing to use Robison's name without permission, stripping Robison's Humboldt shares of any value, and diluting the percentage and value of Robison's ownership interest in assets held by Humboldt.

139.   As a result of Leavitt's and Dennis's civil conspiracy, Humboldt has suffered damages in an amount to be proven at trial.

140.   These defendants' conduct was willful, wanton, malicious, and oppressive, entitling Robison to punitive damages in an amount to be determined by the trier of fact.

## ELEVENTH CLAIM FOR RELIEF
### (Alter Ego: Robison vs. Humboldt, Leavitt & Dennis)

141.   The previous paragraphs are incorporated herein by reference.

142.   Despite purporting to name Robison as CEO of Humboldt on paper, Leavitt and Dennis have failed and refused to acknowledge this position, failed and refused to make this change with the State of Nevada, and continued to make executive decisions affecting Humboldt without regard to corporate structure.

143.   Leavitt and Dennis purported to make the decision to dispose of all Humboldt assets without a shareholder meeting to discuss or vote on the same.

144.     During his time as a shareholder of Humboldt, no noticed shareholder meetings were held and no minutes kept that were approved by the shareholders.

145.     Leavitt was in control of the purse strings for Humboldt. At all relevant times, Humboldt has been grossly undercapitalized and has had insufficient capital to finance its ordinary operations.

146.     Humboldt was influenced and governed by Leavitt and Dennis without regard to the corporate form.

147.     There exists such unity of interest and ownership between Leavitt and Dennis and Humboldt that Humboldt is inseparable from the individuals.

148.     Humboldt is now, or shortly will be, devoid of assets because of the deal effectuated by Leavitt and Dennis with RSF, making it such that adherence to the corporate fiction of a separate entity would, under the circumstances, sanction fraud or promote injustice.

149.     Based on the foregoing, Leavitt and Dennis should be held individually liable for the obligations of Humboldt to Robison.

**TWELFTH CLAIM FOR RELIEF**
**(Dissolution and Receivership: Robison vs. Humboldt)**

150.     The previous paragraphs are incorporated herein by reference.

151.     By at least the conduct alleged herein, Humboldt's directors, Leavitt and Dennis, have colluded against Robison.

152.     By at least the conduct alleged herein, Humboldt's assets are in danger of waste, sacrifice, or loss by being given to RSF in exchange for stock in RSF, a company that is dubious as a going concern, as expressed by its own CPAs.

153.     Robison is at least a one-tenth owner in Humboldt.

154.    By at least the conduct alleged herein, the division among the shareholders of Humboldt, a close corporation, threatens irreparable injury, which they have been unable to resolve between themselves through remedies accorded to them by their rights as shareholders in Humboldt.

155.    As an alternative remedy to any other prayed for herein, Robison is entitled to dissolution and/or a receivership of Humboldt under NRS 78.650 and/or NRS 78A.140(1)(a) and to all accompanying remedies associated therewith, including appropriate exercise of powers over the assets held by Humboldt, a provisional director, and/or a custodian.

### THIRTEENTH CLAIM FOR RELIEF
**(Unjust Enrichment/Quantum Meruit: Robison vs. Humboldt, Leavitt, and Dennis)**

156.    The previous paragraphs are incorporated herein by reference.

157.    Robison rendered services to Humboldt, Leavitt, and Dennis at their request or to their benefit, and thereby conferred a benefit upon them.

158.    These defendants appreciated, accepted, and retained the benefit conferred upon them by Robison under circumstances such that it would be inequitable for them to retain the benefit without payment of the value thereof.

159.    Robison's services were not provided gratuitously.

160.    These defendants understood that compensation would be paid Robison for his services when they were performed.

161.    Robison is entitled to recover the reasonable value of his services, in an amount estimated to be approximately $200,000 to $250,000.

### FOURTEENTH CLAIM FOR RELIEF
**(Fraudulent Transfer: Robison vs. Humboldt and RSF)**

162.    The previous paragraphs are incorporated herein by reference.

163.    On information and belief, Humboldt has transferred substantially all its assets to RSF through the RSF Deal. This was a transfer under NRS 112.150.

164.    Humboldt did so without receiving reasonably equivalent value, as described herein.

165.    At the time of the transfers, Humboldt and RSF both knew that monies were owed to Robison.

166.    Humboldt was insolvent on the date the transfer was made, or became insolvent as a result of such transfer or obligation; or was engaged in a transaction for which any property remaining with Humboldt was unreasonably small capital.

167.    Robison is entitled to an avoidance of the transfer to RSF to the extent necessary to satisfy his claims against Humboldt; to an attachment or other provisional remedy against the property of Humboldt and RSF involved in the transfer; to an injunction against further disposition of property by Humboldt or RSF; to a judgment against these parties in the amount owed to Robison by Humboldt; and/or to such other remedies as may be available under NRS 112.140 et seq.

### FIFTEENTH CLAIM FOR RELIEF
**(Common Law Appropriation Invasion of Privacy: Robison vs. Humboldt & RSF)**

168.    The previous paragraphs are incorporated herein by reference.

169.    Based on at least the conduct alleged herein, Humboldt and RSF have appropriated and used Robison's name for their own use and benefit.

170.    Robison is entitled to damages in an amount to be proven at trial.

### SIXTEENTH CLAIM FOR RELIEF
**(Statutory Violation of Right of Publicity: Robison vs. Humboldt & RSF)**

171.    The previous paragraphs are incorporated herein by reference.

172.   By at least their conduct alleged herein, Humboldt and RSF have used Robison's name for the purposes of selling or soliciting the purchase of a product or service.

173.   The uses each constitute a "commercial use" within the meaning of NRS 597.770(1).

174.   Humboldt and RSF did not obtain written consent from Robison for the commercial use of his name as required by NRS 597.790(2).

175.   Robison is entitled to injunctive relief against Humboldt and RSF to prevent and restrain the unauthorized use of his name under NRS 597.810(1)(a).

176.   Robison is further entitled to actual damages suffered as a result of Humboldt's and RSF's unlawful uses, under NRS 597.810(1)(b)(1), of not less than $750 for each violation.

177.   Humboldt and RSF knowingly used Robison's name without the written consent required by NRS 597.790, entitling him to exemplary or punitive damages under NRS 597.810(1)(b)(2).

### SEVENTEENTH CLAIM FOR RELIEF
**(Declaratory and Injunctive Relief: Robison & Humboldt vs. All Defendants)**

178.   The previous paragraphs are incorporated herein by reference.

179.   A case or controversy exists between the parties as set forth herein.

180.   This Court has the power to declare rights, status, and responsibilities of the parties pursuant to 28 U.S.C. §§ 2201-2202 and Fed. R. Civ. P. 57.

181.   Robison seeks a declaratory judgment regarding the parties' rights, status, and responsibilities with respect to the disputes herein.

182.   The Court should enter a declaratory judgment and order all attendant declaratory relief as may be necessary to a full resolution of the claims and disputes set forth herein.

183.    The defendants' actions as alleged herein include conduct that is continuing in nature, is causing Robison irreparable harm, and cannot fully be compensated by money damages. Robison is entitled to injunctive relief as may be necessary to prohibit future such harm.

## EIGHTEENTH CLAIM FOR RELIEF
### (Vicarious Liability: Robison vs. Humboldt)

184.    The previous paragraphs are incorporated herein by reference.

185.    Conduct undertaken by Leavitt and Dennis as alleged herein was undertaken within the course and scope of their employment with Humboldt and as officers and directors of Humboldt.

186.    Humboldt is vicariously liable to Robison in compensatory damages for all such conduct.

187.    Conduct undertaken by Leavitt and Dennis that was willful, wanton, malicious, and oppressive as alleged herein was undertaken within the course and scope of their employment with Humboldt and as officers and directors of Humboldt.

188.    Humboldt is vicariously liable to Robison in punitive damages for all such conduct pursuant to NRS 42.007.

## NINETEENTH CLAIM FOR RELIEF
### (Successor Liability: Robison vs. RSF)

189.    The previous paragraphs are incorporated herein by reference.

190.    As expressed by Humboldt and RSF, the RSF Deal is intended to be a reorganization of Humboldt and/or a merger into, or acquisition by, RSF.

191.    By Humboldt and RSF structuring the RSF Deal the way they did, RSF is a continuation of Humboldt.

192.    RSF is liable to Robison as a successor entity to Humboldt for all compensatory and punitive damages for which Humboldt is liable to Robison.

### JURY DEMAND

Plaintiff individually and derivatively for Humboldt demands a jury on all claims triable to a jury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief as set forth herein:

1.    Compensatory damages as set forth herein.

2.    Punitive damages as set forth herein.

3.    Statutory relief as set forth herein.

4.    Declaratory and injunctive relief as set forth herein.

5.    Costs and attorney fees as may be allowed by law.

6.    Such other and further relief as the Court deems just and equitable in the circumstances.

DATED this 6th day of October, 2016.

STEPHEN K. CHRISTIANSEN, ATTORNEY AT LAW


By:    /s/ Stephen K. Christiansen
       Stephen K. Christiansen
       *Attorney for Plaintiff*


VERIFIED AS TO FACTUAL ALLEGATIONS:


       /s/ Robert R. Robison
Plaintiff (authorization given to legal counsel to e-sign on his behalf)